United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8     IN THE UNITED STATES DISTRICT COURT

9     FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   JOSE DANIEL RODRIGUEZ, F-82059,          No. C 11-1010 CRB (PR)

12          Petitioner,                       ORDER DENYING PETITION
                                              FOR A WRIT OF HABEAS
13      vs.                                   CORPUS AND DENYING
                                              CERTIFICATE OF
14   M. McDONALD, Warden,                     APPEALABILITY

15          Respondent.
                                         /
16

17          Petitioner seeks a writ of habeas corpus under 28 U.S.C. § 2254.  The petition

18   originally was filed in the United States District Court for the Eastern District of California,

19   which transferred it here.

20          In an order filed on May 11, 2011, the court found that the petition, when liberally

21   construed, stated cognizable claims under section 2254 and ordered respondent to show

22   cause why a writ of habeas corpus should not be granted.  Respondent has filed an answer

23   and lodged the record with the court.  Although he was granted an extension of time to do so,

24   petitioner has not filed a traverse.  Having reviewed the papers and the underlying record, the

25   court concludes that petitioner is not entitled to habeas corpus relief.

26                              **STATEMENT OF THE CASE**

27          A San Mateo County jury convicted petitioner of numerous sex offenses against four

28   children.  People v. Rodriguez, No. A118764, 2010 WL 453543 at *1, 6.  On July 27, 2007,

he was sentenced to ninety-six years in state prison.  Id. at *6.  Petitioner unsuccessfully appealed his conviction to the California Court of Appeal.  The Supreme Court of California denied his petition for review.  The claims he presents here were raised on direct appeal.

## STATEMENT OF THE FACTS

The California Court of Appeal set out the background:

> In December 2003, the San Mateo County District Attorney filed an information against defendant alleging 44 counts of sodomy, oral copulation, rape, attempted sodomy, and lewd and lascivious conduct with minors under the age of 14, as well as related enhancement allegations. The counts and allegations alleged that defendant had committed sex offenses from 1992 to 1995 against four minors, the children of his cousin Blanca and siblings in one family, they being two brothers, Cesar and Rafael, and two sisters, Evelyn and Sandra. After the amendment of the information and dismissal of some counts, defendant was tried in 2007 on 33 of the original 44 counts.

> **Evelyn's Testimony**
>
> Evelyn, born in 1981, testified that defendant stayed at her family's home on Third Avenue in Redwood City, probably beginning in 1992. Four or five months after his arrival, after she came home from school, he grabbed her arm and pushed her onto the couch where he slept, pulled down her pants, penetrated her vaginally and in her anus, and told her that he would kill her if she told her mother. He repeatedly penetrated her, sometimes every other day, sometimes once a week, at the family's home on Third Avenue. She orally copulated him "probably eight times." When she said no to him, he would take out a knife that he carried, cut himself, and tell her that is how she would bleed if she did not listen to him. He showed her the knife six or seven times at the Third Street house. Four or five times, defendant shot a BB gun at cans in the backyard and told her this was what was going to happen to her if she did not do as he said.

> Evelyn testified to other incidents at the Third Avenue house involving defendant's conduct towards her siblings. Once, she saw defendant and Cesar in bed, defendant's pants on the ground and Cesar's pulled down, Cesar on his stomach and defendant behind him. On another occasion, after she refused to go into the bedroom with defendant, he grabbed her younger sister Sandra and took her into a room, and Sandra came out crying. When Cesar tried to confront defendant about it, defendant pushed him out of the way and left. Once, defendant took her younger brother Rafael into a bedroom and closed the door, and Rafael was crying when he came out. On another occasion, defendant told Cesar to take Rafael into a bedroom and do what defendant had done to Cesar. When Cesar refused, defendant grabbed them both and told them to do what he said. She heard defendant inside the bedroom telling Cesar, "That's not how you do it. Here's how you do it," and heard Rafael crying.

> Sometimes defendant would tell Evelyn he wanted her to come out when he knocked on her locked bedroom door at night. If she did not, he would tell her that her mother would get in trouble because of what Cesar was doing to Rafael.

**United States District Court**
For the Northern District of California

Defendant moved out of the Third Avenue house, but he continued his sexual assaults on the children at his apartment. He would come by the house and offer Blanca to take the children out and, when Blanca looked away, he would take out his knife; the children would then ask if they could go out with him. He would take Evelyn to his apartment and penetrate her with his penis or fingers, and have her orally copulate him while showing her pornographic films. He took her into his bedroom six or seven times. Cesar took Rafael into the bedroom at his apartment "probably twice." Defendant continued to threaten them by telling them he would call the police, and that their mother and Cesar would go to jail.

The family moved to Elm Street in 1994. Defendant would take them to Sequoia Station in Redwood City, where he penetrated Evelyn five or six times in a car in the parking lot. He also grabbed her breasts and orally copulated her two or three times.

Defendant moved into their Elm Street house for a couple of months, where he continued his assaults. He would pinch Evelyn on the butt and have sex with her. He also took Rafael and Sandra separately into a room with him, and they each were crying when they came out. He left the day after her mother saw him pressing against Evelyn in the laundry room.

Evelyn did not disclose what defendant had done for some time. For example, she did not tell Child Protective Services representatives, who investigated a complaint that her mother beat the children a few days after defendant left the Elm Street house, for fear that the family would be broken up. In 2003, when Sandra told her that defendant might be moving back to Northern California, she told her mother what defendant had done.

Evelyn did not tell her mother at that time about Cesar's sexual abuse of the younger children because she did not want to cause harm to Cesar, and she told Rafael not to say anything about Cesar abusing him because she thought Cesar was a victim. She told social workers and police that she first learned about Cesar molesting Rafael and Sandra in 2003, but she testified at trial that she knew all along about Cesar's actions. She tried to protect Cesar, and hoped that Sandra would change her mind and that no one would believe Rafael because of his mental problems. She did not want to hurt her parents more, and she was scared and worried for Cesar.

***Sandra's Testimony***

Sandra, born in 1987, testified that defendant began touching her between her thighs and chest when she was five or six, but did not initially touch her vagina; he would put his penis between her legs and rub, and he ejaculated. Once he tried to put his penis inside her but could not. When she cried and told him to stop, he turned her around and penetrated her anus. She did not remember the exact number of times he ejaculated inside her when they lived on Third Avenue, but it was more than once.

When they lived on Elm Street, defendant once took her into his bedroom and, with her pants down, rubbed his penis on top of her vagina. Defendant rubbed his penis on her body more than once. Sandra thought he touched her in the vaginal area with his penis more than 30 times. He had her orally copulate him twice, and anally penetrated her with his penis two or more times. She did not recall any incident between her and defendant at Sequoia Station.

3

United States District Court
For the Northern District of California

Sandra also testified about defendant's conduct with her siblings. Defendant took Evelyn and Rafael separately into his room, and they would each come out crying. He once had her orally copulate him and Rafael orally copulate Cesar at the same time. Once, defendant took Rafael up to the attic where defendant worked at Paw Prints, and she heard Rafael crying. Sandra once walked in on defendant and Evelyn, and saw defendant's shoulders and Evelyn on the bed, and when Evelyn came out of the room she was crying and was sweaty. Defendant would yank a resisting Rafael into the bedroom.

Defendant threatened the children by saying that if they ever told their mother what he had done they would regret it. He told them that their mother would not believe them and would go to jail.

Cesar sexually assaulted Sandra two or three times a month. He penetrated her anus occasionally, but did not penetrate her vagina. Cesar continued to assault her until she was about 11 years old. He also would pull Rafael into the bedroom, and Rafael would come out crying.

Sandra told her mother about what defendant and Cesar had done in June 2003, when she learned that defendant might be moving back in with them. She was afraid to tell because she thought no one would believe her, and defendant had told her that her mother would go to jail. She told police and counselors that her mother knew all along about Cesar, which was not true, because Sandra did not want to go home, but she later said that her mother did not know. When the younger children were taken from the home, Evelyn told Sandra to say that her allegations about Cesar were not true.

### Rafael's Testimony

Rafael, born in 1983, testified that he was being treated for paranoid schizophrenia. Defendant moved below to exclude Rafael's testimony based on his delusions, which the trial court denied; defendant argues on appeal that the court's ruling was prejudicial error. We discuss his appellate argument, and Rafael's testimony about his delusions, further in part II post.

Rafael testified that after he came to the United States in 1993, defendant would come over to the house, pull down Rafael's pants, and rape him. Defendant once touched Rafael at the "new house" (perhaps referring to the Elm Street house). Defendant once told him that if he wanted to play Nintendo, Rafael would have to have sex with him first, which then occurred. Defendant told Rafael that he would kill him if he told the police.

Defendant also told Cesar to rape Rafael, and Cesar did so for several years. During one incident, when Cesar came out of a room with Sandra, defendant slapped her and said that if she did not want sex, Cesar should "take" Rafael. Cesar then grabbed Rafael and raped him. Rafael slept in the same room as Cesar at Elm Street, and estimated that Cesar raped him 2,000 times. He also testified that he believed that extraterrestrials told him that Cesar had molested him 20,000 times, and that he believed this was true. Once Cesar held a long kitchen knife to Rafael's neck when Rafael did not want to have sex with him and another time, Cesar used the knife to walk Rafael to a room. He raped Rafael both times.

Rafael also testified that defendant and Cesar assaulted his siblings. Defendant raped Sandra at Sequoia Station. One time, Rafael acted as a

lookout in case anyone approached while defendant took Evelyn into one area and Cesar took Sandra into another.

Rafael also testified that he had been mistreated by his mother and siblings. Among other things, he testified that his mother hit him with a jump rope and three-foot stick, then told him to lie to authorities when he complained. She hit him with a belt because he did not speak English at Elm Street. In his view, his mother, Sandra, and Evelyn mistreated him in other ways as well.

### Cesar's Testimony

Cesar, born in 1978, testified that he was a convicted felon serving a 10-year sentence for lewd and lascivious acts committed against Sandra. He said that he was not promised anything in exchange for his testimony.

According to Cesar, defendant began committing sexual acts on him a few months after coming to live with the family in 1991. Defendant showed Cesar a pornographic movie and asked Cesar to let him do things to him that were shown in the movie. Defendant got behind Cesar, pulled down his pants, and tried to penetrate Cesar's anus with his penis, but did not do so. Defendant told him not to tell anyone.

Defendant committed "countless," and more than 20, similar acts of sodomy on Cesar at the family's Third Avenue house. Defendant engaged in sexual conduct with Cesar three or four times a week while he lived there, including at a Safeway underground parking garage at Sequoia Station and where defendant worked. Cesar also engaged in sexual conduct with defendant one time at defendant's residence.

Cesar also described sexual assaults by defendant on his siblings. Cesar saw defendant tell Sandra to put defendant's penis in her mouth when she was four or five years old, which she did. At a later time, Cesar saw defendant have sex with Rafael. Defendant had sex with one or another of Cesar's siblings about six times at the Safeway parking garage. Defendant had sex with Evelyn and sodomized Rafael and Sandra there. At the Third Avenue house, defendant would go into a bedroom with Evelyn, they would argue and his sister would cry, and they would come out 20 to 45 minutes later, with Evelyn always upset, but Cesar did not actually see them have sex there. Defendant would separately take Sandra and Rafael into the room, and Rafael would come out crying. When Rafael would refuse to have sex with defendant, defendant would pull him in a forceful way. Rafael would be in defendant's room for 20 to 25 minutes, and come out crying.

Defendant told Cesar to engage in similar sexual conduct as he, and Cesar did so. Defendant would tell Cesar to have sex with Rafael, and Cesar would then penetrate Rafael after holding him down. Rafael cried and appeared to be in pain. Cesar did this repeatedly to Rafael. Defendant told him it was normal. Cesar also brought Sandra into his room, pulled down her pants, and put his penis between her legs and moved back and forth. He penetrated her anus, sodomizing her two times a month at least.

At his apartment, defendant would take Evelyn and Rafael to his room. Cesar sodomized Rafael 10 to 15 times at the apartment. Cesar would tell Rafael to put his mouth on his penis, or defendant would penetrate him.

5

Defendant told Cesar that if he told his parents what defendant had done, defendant would tell them about Cesar's actions and would call the social workers on his mother. He also told Cesar he would be in trouble if he told anyone.

After the family moved to Elm Street without defendant, Cesar continued to sexually assault Rafael and Sandra. He assaulted Rafael two to three times per month, and Sandra once a month. When defendant moved back in with the family, Cesar engaged in sodomy with him almost every night. Cesar saw defendant take Evelyn twice to a room, and Rafael more than six times. When defendant permanently moved out, Cesar continued to sexually assault Sandra and Rafael. He stopped assaulting Sandra when she was 19 because she told him it was not right. He stopped assaulting Rafael about four months later, when he moved out of the house.

In 2003, Evelyn told him that she and Sandra had told their parents what defendant had done to them. Cesar told them not to be afraid and just tell everything. His siblings told him they were not going to tell on him.

When police contacted him, Cesar did not tell about his assaults on Rafael and Sandra because he was afraid of going to jail and not seeing his family again. He told police what defendant had done, but did not tell them what he had done.

In January 2004, Cesar argued with Sandra and pushed her. Sandra said she was going to kill herself, so Cesar called the police, and Sandra was hospitalized. A couple of days later he admitted to his parents what he had done to Sandra and Rafael.

About two years later, Cesar entered a guilty plea to three counts of sexual assault regarding Sandra. He lied about the severity of some of his acts and the number of times he had assaulted her. He was not charged for offenses against Rafael, so he faced a 12-year sentence, rather than a life sentence. He was serving a 10-year term, having been convicted of three sex offenses against Sandra.

### Defendant's Testimony

Defendant, born in 1969, testified that he moved from El Salvador to Redwood City in 1990, and moved into the Third Avenue home soon thereafter. He was hired at Chili's in Menlo Park, where he worked for about a year, leaving the house about 5:30 a.m. and returning about 4:30 p.m., when adults and the children were home. He started working at Paw Prints from September 1991 to April 1995, where he worked from 8:00 a.m. to 5:00 p.m., arriving home about 5:15 p.m. to 5:20 p.m.

Defendant stated that he did not engage in any sexual acts with Evelyn, Sandra, Rafael, or Cesar. He never told Cesar to have sexual contact with Evelyn, Sandra, or Rafael. He never had any pornographic or sexual materials, and did not show any such materials to the children. He did not threaten the children, did not tell them that he would tell about Cesar's homosexual behavior if they reported defendant, and did not tell them that he would call Child Protective Services or that their mother would end up in jail if they reported him for molesting them. Defendant went to Sequoia Station six or seven times with Cesar to listen to music, but usually walked and, even when he drove, did not go into the underground parking lot.

6

United States District Court
For the Northern District of California

During the times defendant lived with the family, he saw the children's mother, Blanca, use physical force against Evelyn, hitting her with a ruler. He saw marks on Evelyn's back and legs and a small cut on her leg from when Blanca had hit her with the buckle of a belt. He also saw Blanca hit Rafael with a ruler, belt, or "whatever she could." He did not see her hit Cesar or Sandra. Defendant did not have any intention of returning to Redwood City in 2003, and did not tell anyone that he intended to return.

### Other Testimony

Reverend Ana Lange-Soto testified that Blanca, Evelyn, Rafael, and Sandra came to talk with her in June 2003. Blanca told her that defendant had molested the children when he lived with them. Blanca told the children to tell the pastor everything, and the girls gave some details, but they made no mention of Cesar's offenses. However, when Blanca left the room, they told the pastor about Cesar's molestation of Rafael and Sandra. The pastor told the children to tell their parents, but Evelyn said no, and the children asked the pastor not tell anyone. The pastor did not tell anyone about Cesar because she did not think there was a present risk. The People also presented the testimony of an expert on child abuse accommodation syndrome.

Defendant's employer at Paw Prints testified that defendant worked from 9:00 am to 5:00 p.m., Monday through Friday. He did not have a position that permitted him to leave the premises, and he was absent from work only a few times for a week. He only had a half-hour lunch break.

### Verdicts, Sentencing, and Appeal

Defendant was found guilty by the jury on all but two counts, these two being the charges that he engaged in oral copulation with Cesar, and all related allegations were found to be true. In July 2007, the court sentenced defendant to state prison for an unstayed term of 96 years. Defendant filed a timely notice of appeal.

Rodriguez, 2010 WL 453543 at *1-6.

## DISCUSSION

### A.    Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Id. § 2254(d).

**United States District Court**
For the Northern District of California

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]  Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412.  Circuit law may be "persuasive authority" for purposes of determining whether a state court decision was unreasonable, but only the Supreme Court's holdings are binding on the state courts, and only those holdings need be "reasonably" applied. Id.

**B.      Claims & Analysis**

As grounds for relief, petitioner contends that:  (1) The trial court violated his Miranda rights by denying his motion to suppress statements he gave to a police officer after saying he "would rather" talk to an attorney; (2) the trial court "erred" by denying petitioner's motion to exclude the testimony of one of the victims; (3) the prosecutor engaged in misconduct when cross-examining a witness and in closing argument; and (4) the court improperly imposed upper term sentences on some charges based on aggravating factors not found by the jury.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

### 1.    <u>Miranda</u> Claim

Petitioner contends that his <u>Miranda</u>[1] rights were violated when the trial court denied his motion to suppress statements made to a police interviewer after saying he "would rather" talk to an attorney.  The court of appeal set out the background:

> Detective Craig McIver testified at the hearing regarding defendant's motion that on September 9, 2003, while working as a Garden Grove Police Department investigator assigned to the sexual assaults and child abuse division, he received a telephone call from Detective Banks of the Redwood City Police Department. About a month and a half or two months earlier, Banks had told McIver that he was investigating defendant, who had been accused of sexual assault crimes against children. Now, Banks told him there was an arrest warrant for defendant, provided defendant's date of birth, photo and suspected address, asked McIver to try and locate him, and told him not to ask defendant anything. Banks did not give McIver any specific details about the crime involved, but McIver obtained a copy of the warrant that listed the charges against defendant.
>
> McIver further testified that he and his partner located defendant at his place of employment and arrested him. When defendant asked why they were arresting him, McIver responded that it was for an outstanding warrant out of Redwood City, and that he had no details and did not know anything about the case. Defendant stated that "he would rather talk to his attorney about this warrant." McIver told defendant he was not going to ask him anything about the case and did not know about it.
>
> McGiver [sic] testified that as he drove defendant to the Garden Grove Police Department, neither he nor his partner discussed anything related to the case, nor did they talk with defendant. McIver had no intention of interrogating him. Defendant was released to jail staff and transported to an Orange County jail. McIver wrote up defendant's statements in his arrest report the same day. He "most likely" faxed a copy of defendant's arrest report to Redwood City Police Department the next day, September 10, 2006.
>
> Defendant testified that, when he was in the police car, McIver told him there was a million-dollar warrant out for him in Redwood City, that that was a lot of money, and asked whether defendant knew what was happening there and wanted to tell him about it. Defendant requested an attorney because he was being arrested without explanation. McIver said he was not going to ask him anything more. Defendant acknowledged that when Banks interviewed him the next week in Redwood City, he did not request an attorney.
>
> McIver, upon being recalled to the stand, denied saying what defendant claimed he had said. McIver also testified about the contents of his arrest report. His report indicated that defendant had said he would rather talk to his attorney about the warrant, and that McIver was not going to ask defendant about the case because McIver did not know anything about it.

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436, 473-74 (1966)

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The parties stipulated that defendant was continually in custody from the date of his arrest through September 16, 2006, when he arrived in Redwood City, and that on that same day, Banks read defendant his <u>Miranda</u> rights, and that defendant understood them. Banks interviewed defendant and the interrogation was recorded. The parties also stipulated that Banks had not received or reviewed the arrest report prior to interrogating defendant, and that defendant was not arraigned, and a public defender was not appointed, until 1:30 p.m. that afternoon.

After hearing arguments from both sides, the court denied defendant's motion to exclude Banks's interrogation of him on the ground that defendant did not make a clear and unequivocal indication that he wanted an attorney to assist him with custodial interrogation. The court relied on <u>People v. Nguyen</u> (2005) 132 Cal. App. 4th 350 (<u>Nguyen</u>) in its ruling.

<u>People v. Rodriguez</u>, No. A118764, 2010 WL 453543 at *6-7.

The court of appeal deferred to the trial court's determination that McIver's version of events was the correct one, <u>id.</u> at *8 n. 1, and held that his invocation of his right to counsel a week before any custodial interrogation was not "with regard to any present or imminent interrogation," <u>id.</u> at 8. The court also held that petitioner's statement that he "would rather talk to his attorney about this warrant" was not a sufficiently "clear and unambiguous invocation of his <u>Miranda</u> right to counsel" as to bar the later interrogation. <u>Id.</u> at *9-10.

A suspect who has expressed a desire to have counsel present during custodial interrogation is not subject to further interrogation by the authorities until counsel is made available to him, unless the suspect himself initiates further communication with the police. <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981). A suspect may not invoke his <u>Miranda</u> rights anticipatorily in a context other than custodial interrogation, however. <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 182 n. 3 (1991); <u>see also</u> <u>Bobby v. Dixon</u>, 132 S. Ct. 26, 29 (2011) (per curiam).

The facts here are quite similar to those of one of the three issues in <u>Bobby v. Dixon</u>. The defendant there, Dixon, invoked his right to counsel in a non-custodial interrogation four days before police conducted a custodial interrogation in which Dixon confessed. <u>Id.</u> at 29. The Court held that in light of <u>McNeil</u>, the  lower court was "plainly wrong" in holding that police could not speak to Dixon the second time without counsel being present, because <u>Miranda</u> cannot be invoked anticipatorily in a noncustodial situation. <u>Id.</u>

1    In view of <u>Dixon</u>, there was no <u>Edwards</u> violation here, and the court of appeal

2    holding on this point was not contrary to, or an unreasonable application of, clearly-

3    established Supreme Court authority.

4    **2.    Admission of Testimony of Incompetent Witness**

5    Petitioner contends that the trial court "erred" by denying his motion to exclude the

6    testimony of one of the victims, Rafael, who suffered from a mental illness.  The court of

7    appeal set out the background:

8    **A.  *Proceedings Below***

9    **1.  *Rafael's Testimony at the Section 402 Hearing***

10        The court held a hearing pursuant to Penal Code section 402 to evaluate
     Rafael's competence to testify. Rafael testified coherently on direct
11   examination about his personal information. He stated that he was in a
     courtroom to testify about sexual abuse, identified the judge, and stated that he
12   knew the difference between a truth and a lie, answering questions to confirm
     this appropriately.

13        On cross-examination, Rafael testified about a number of obvious
14   delusions. He said he had caused a computer breakdown in China due to a virus
     in his computer. Extraterrestrials, who had started talking to him the year
15   before his testimony, told him that his father wanted to cut off his penis, that he
     had sexual abuse committed against him, and that his sister wanted to cut off
16   his penis. He saw Jesus Christ with a time machine in his backyard about a
     year before also. He had been a victim of witchcraft, and the extraterrestrials
17   had told him he had died. The extraterrestrials had started talking to him about
     a year before.

18
19        On redirect examination, Rafael identified defendant as having lived
     with the family on Elm Street. He described an incident when defendant
20   sodomized him, said defendant told him he would kill him, and that his brother
     had been sexually abusing him as well, stating that his brother had done so
21   "[m]any times. The extra terrestrials calculated about 20,000 times."

22        At this point, the court stopped the proceedings, indicated that it was not
     prepared to have Rafael testify at that time, and put Rafael on "standby" until it
23   decided whether or not to allow him to testify.

24        The next week, Rafael testified further at the section 402 hearing. On
     direct examination, he testified that his recollections about the things that
25   defendant and Cesar had done to him at his home were from his own memory,
     and not from someone telling him what had happened. The alien voices were
26   not present, nor was Jesus Christ, when defendant or his brother had molested
     him at his home. The aliens did not tell him what had happened to him in 1993.
27   The first time he heard their voices in his head was Christmas 2006. He was no
     longer hearing voices, and had not heard them the week before when he
28   testified. The aliens never showed him pictures of what happened to him when
     he was younger.

On cross-examination, Rafael testified that the extraterrestrials did not tell him what happened in 1993. They did tell him that Cesar had raped him 20,000 times. Rafael estimated these rapes at 2,000 times, but then said that he did not disagree with the extraterrestrial's estimate, and agreed when asked that he was saying that Cesar raped him 20,000 times. He also said that "they" put him inside Jesus Christ's time machine a year before his testimony and he went to 2004 for a week. He did not go to 1993 and did not see Cesar. During his time in 2004, the extraterrestrials talked about a lot of things, but not about defendant or Cesar, and he did not remember what they told him. He did not go back to the Third Avenue or Elm Street homes.

Rafael also thought the aliens were trying to turn him into a dog, because when he was alone they touched him, and his body hurt when they did. He told them to stop, but they did not say anything, and condemned him to the death penalty. As he sat there testifying, he did not think they had given him the death penalty, though they did not tell him that he was free from the death penalty. He did not know if it was true that the aliens talked to him. The last time they told him something was nine months before. They did not tell him things that he lived through in the early 1990's.

Rafael believed that his father was Jesus Christ, and that his father wanted to cut off his penis, as the extraterrestrials had told him. Neither his father or sister cut off his penis. One time in 2006, a force with wings, the Holy Spirit, part human, part with claws, put his penis in Rafael's anal area. Rafael was sometimes afraid of his sister, and believed the President would protect him from her.

Rafael further testified that the extraterrestrials saw what Cesar did to him in 1993 and laughed about it. Cesar continued to rape him from 1994 to 1998, but the extraterrestrials did not tell him that they saw some of those rapes also. They saw everything, but their voices did not tell him what they saw. When asked how he knew what they saw and what they said about it, Rafael said, "Because I heard-I would hear voices. I saved my life, so as not to hear them because they were complaining a lot."

He further testified that "evil people" were still scratching his body, and showed scratches on one of his legs. There were worms in his head for the past year moving around, but they did not make it hard for him to remember things. Jesus Christ put the devil's paw on his right leg, and put a tail on the back of his body, but they went away with the time machine.

Rafael also stated that the extraterrestrials had not told him anything about his mother or Third Avenue beyond what he had already testified about, and did not tell him anything about what happened when he lived on Elm Street, when Cesar still raped him. However, he had testified earlier that the extraterrestrials told him about Cesar doing things to him before 1998, and he was living on Elm Street before 1998.

On redirect examination, Rafael said he was taking his medication every day, heard voices less, and that the Holy Spirit and Jesus Christ were waiting and hiding, but were not paying attention to him and not talking to him as long as he took his medication. No one was talking to him as he testified. He understood he was to testify from his memories, not what the aliens told him, and stated that he could do so.

12

United States District Court
For the Northern District of California

On recross-examination, when asked "if I said Cesar raped you 20,000 times, would it be a truth or a lie," Rafael answered, "It would be the truth."

**2. *The Court's Ruling***

After hearing arguments from counsel, the court denied defendant's motion. Relying on the Supreme Court's discussion regarding a trial court's determinations about the competency of a witness to testify in People v. Anderson (2001) 25 Cal. 4th 543 (Anderson), the court noted that Rafael testified that the voices started talking to him in the last three years or less, which was not in the time period in question, and that his delusions, "while they clearly are delusions, are not directly related to what happened to him in this case." As for his testimony that he was raped by Cesar 2,000 times, but that it was true that, as the aliens said, he had been raped 20,000 times, the court stated:

"I think in this kind of a case, we don't, again, know how many times these things allegedly happened. Clearly they happened a lot over a long period of time, and I don't think alleged victims of crime sit there and ... mark down every time it happened. I think it kind of runs together. So, I'm not saying that I think someone would find it credible he was assaulted 20,000 times. But, I am saying that in someone's mind, it can run into a lot more than maybe factually happened, but that's not really the issue before me. [¶] The issue before me, is he able to recollect the questions, and is he able to testify from his own memory."

Defense counsel argued that Rafael was not testifying from his own memory if the extraterrestrials guided him to the 20,000 figure. The court disagreed with this statement "from the testimony," but agreed that Rafael was saying that the extraterrestrials said he was assaulted 20,000 times. The court then concluded that Rafael was competent to testify.

Rafael proceeded to testify, much of which we have already recounted in the background portion, ante. Along with his recollections of the sexual offenses that defendant and Cesar committed against him, he testified about his mental illness, the voices he heard, and many of the delusions and other beliefs he had stated at the section 402 hearing.

Rodriquez, 2010 WL 453543 at *10-12.

The court of appeal rejected the claim:

Defendant argues that the trial court erred in admitting Rafael's testimony. We disagree.

Except as provided by statute, every person is qualified to be a witness and no person is disqualified from testifying to any matter. (Evid. Code, § 700.) A person is disqualified to be a witness if he or she is incapable either "of expressing himself or herself concerning the matter so as to be understood," or "of understanding the duty of a witness to tell the truth." (Evid. Code, § 701, subd. (a)(1) & (2).) Furthermore, "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter." (Evid. Code, § 702, subd. (a).)

In Anderson, supra, 25 Cal. 4th 543, our Supreme Court considered the claim that a witness's delusions that her imaginary son was present at the

13

United States District Court
For the Northern District of California

subject murder rendered her incompetent to testify about the murder. (Id. at p. 571.) The court summarized the rules regarding the trial court's evaluation of a witness's competency. It acknowledged that Evidence Code sections 700, 701, and 702 governed the competency of witnesses (Anderson, at pp. 572-574), and stated that "[c]apacity to communicate, or to understand the duty of truthful testimony, is a preliminary fact to be determined exclusively by the court, the burden of proof is on the party who objects to the proffered witness, and a trial court's determination will be upheld in the absence of a clear abuse of discretion." (Id. at p. 573.) The Supreme Court observed that "[u]nder the Evidence Code, the capacity to perceive and recollect particular events is subsumed within the issue of personal knowledge, and is thus determined 'in a different manner' from the capacity to communicate or to understand the duty of truth." (Ibid.) " 'Because a witness, qualified under [Evidence Code] [s]ection 701, must have personal knowledge of the facts to which he testifies ([Evidence Code] [s]ection 702), he must, of course, have the capacity to perceive and to recollect those facts. But the court may exclude the testimony of a witness for lack of personal knowledge only if no jury could reasonably find that he has such knowledge.' " (Ibid.)

The Anderson court noted that there was no serious claim that the witness could not communicate her memories coherently or understand that she must recount them truthfully. (Anderson, supra, 25 Cal. 4th at p. 574.) The court focused on defendant's contention that she lacked the capacity to perceive and recollect her memories accurately because of her delusions about the presence of her imaginary son during the murder. (Id. at p. 574.) The court concluded that the trial court did not err. (Id. at p. 575.) It agreed with the trial court that there were "many indicia by which a rational trier of fact could conclude that [the witness], despite her specific delusions ... had accurately perceived and recollected" the events of the murder and, aside from her insistence of her imaginary son's presence, "presented a plausible account" of the circumstances of the murder. (Id. at p. 574.)

Defendant argues that "Rafael lacked the ability to tell the difference between the truth and his delusions and imaginations" because he insisted that the voices had told him, and he had believed, that Cesar had raped him 20,000 times. Defendant contends that this established that Rafael was incapable of understanding his duty to tell the truth, because he had no idea what was true, thereby failing to meet the standard required by Evidence Code section 701, subdivision (a)(2). Defendant cites People v. Mincey (1992) 2 Cal. 4th 408, and People v. Dennis (1998) 17 Cal. 4th 468, in support of his argument. Each case, however, found that the trial court did not abuse its discretion in finding the challenged witness competent to testify. (Mincey, at p. 444; Dennis, at p. 525.)

We are not persuaded by defendant's argument. Rafael testified both that he thought that Cesar had raped him 2,000 times, and that the extraterrestrials told him that Cesar had raped him 20,000 times, which he believed was true. To the extent this testimony was inconsistent, we agree with the trial court that it was not a basis for concluding that he did not know what was the truth about the relevant events. As the trial court indicated, Rafael's testimony indicated that he was sexually assaulted by Cesar many times over several years, and such events could run together in the mind of a witness and become difficult to estimate, particularly when events had occurred years before when the witness was a child. The 20,000 figure was not credible, but we think it was analogous to the woman's delusion about her imaginary son in Anderson, supra, 25 Cal.

4th 543, in that it did not relate directly to Rafael's recollections of what he perceived at the time the offenses occurred. (<u>Id.</u> at pp. 572-575; <u>see also</u> <u>People v. Lewis</u> (2001) 26 Cal. 4th 334, 356-357 [relying on <u>Anderson</u> to conclude that a witness had been competent to testify about the events in question and presented a plausible version of events, despite suffering delusions and giving sometimes incomprehensible testimony].)

There was no suggestion that Rafael's recollections of any of the relevant events indicated that he did not know what was true, or lacked personal knowledge about them. He expressed himself coherently, stated that he understood his obligation to tell the truth based on his own recollections, and had sufficient personal knowledge to qualify as a testifying witness under the "rational trier of fact" test discussed in <u>Anderson</u>, <u>supra</u>, 25 Cal. 4th 543. He consistently responded to questions with relevant, specific, and measured answers. He indicated that he was testifying about events involving defendant and Cesar from his own memories and did not hear voices when these events occurred, stated that the voices did not tell him about these events, distinguished between his own memories and what the voices told him, indicated he was taking his medication, and stated that he had not heard voices for nine months and did not hear them at the time he was testifying. Furthermore, his testimony was consistent with that of each of his siblings. Thus, there were sufficient indicia for the trial court to conclude that Rafael was competent to testify. It was for the trier of fact, not the trial court, to evaluate the credibility of his testimony. (<u>Id.</u> at p. 575.) The trial court did not abuse its discretion in finding Rafael was competent to testify.

<u>Rodriquez</u>, 2010 WL 453543 at *12-14.

In his petition, petitioner phrases this issue solely in state law terms – he contends that the trial court "erred" and cites only a state case in support, <u>People v. McCaughan</u>, 49 Cal. 2d 409, 420 (1957). He thus has failed to specify a federal ground for relief. <u>See</u> Rule 2(c) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (petitioner shall "specify all the grounds for relief available to the petitioner ... ."). Furthermore, the witness' mental illness was brought out in extensive cross, and in any event the veracity or competence of a witness is generally a matter of state law and not a federal question. <u>See</u> <u>Schlette v. California</u>, 284 F.2d 827, 834-35 (9th Cir. 1960). And although it is true that in some circumstances due process requires that the trial court hold a hearing to determine a witness' competence, <u>Walters v. McCormick</u>, 122 F.3d 1172, 1176 (9th Cir. 1997), such a hearing was held here. This claim is without merit.

### 3.    Prosecutorial Misconduct

Petitioner claims that the prosecutor committed  misconduct when cross-examining a witness and in closing argument.  The court of appeal set out the facts:

15

Andy Mazon was Sandra's former boyfriend. On direct examination, he testified that during the year or so that he went out with Sandra, in 2003 and 2004, he visited her home on Elm Street 30 or 40 times. He often saw Blanca slap her two younger children, Jonathan and Cindy, hit them "on the butt," and use foul language with them. He also saw Blanca chase these children while holding an electrical cord, followed by sounds of the children crying and screaming, though he never saw Blanca hit them with the cord. Sandra told him that her mother had beaten her worse, with electric cords, as had been the case with her brothers and sisters. Sandra also told him that Cesar had molested and raped her, and molested her older brother and her sister Evelyn. In 2004, when Sandra was in the hospital, Blanca visited her and told her to stop talking about Cesar. Blanca was very close to Cesar, but she sometimes used bad language towards Sandra.

Mazon also testified on direct examination that he "broke up with Sandra because he could not deal with what was going on between her family," and that she attacked him when he returned one of her letters to her.

On cross-examination, Mazon acknowledged that he had spoken a couple of times to a defense investigator in the case. He further acknowledged that the investigator, Joseph Lopez, had come to his house and said he wanted to talk to him about a case involving Sandra, and basically explained what was going on in the case and why he wanted to talk to him. The following exchange then occurred:

"Q. Mr. Lopez, when he was talking to you, told you that this was about a case not involving Cesar, but somebody else who had molested Sandra, right?
"A. Yeah.
"Q. Okay. And he told you; did he not-I'm looking at his report-that he, that the defense in this case was that the mother had coerced Sandra into participating in a pact of silence to not talk about Cesar. Do you remember that?
"A. Yeah.
"Q. Okay. And then do you remember that he told you that the reason Sandra agreed to do that was because the mother was a very mean, aggressive, abusive, person who had forced all the kids into doing this?
"A. Yeah.
"Q. Okay. And you remember that he told you they had lots of evidence from the past when CPS had come into the home and had-basically they had-they had proof that the mother had used things like electrical cords on the kids in the past?"

Outside the presence of the jury, defense counsel objected to this entire line of questioning, arguing that the prosecutor misrepresented to the jury that it all was written in the investigator's report when it was not written in either investigator report, and that this was prosecutorial misconduct that required a mistrial. The prosecutor responded that she had a good faith belief that the investigator had told Mazon about the CPS reports because Mazon's statement followed line by line the information from the CPS reports, and was "too closely tailored to the facts to have been spontaneous." The court concluded that the prosecutor asked the last, unanswered question without having a good faith belief that it was what happened. It denied the defense request for a mistrial and for an admonition to the jury about misconduct, and denied the defense's request to strike all four questions. The court then told the jury that it was sustaining the objection, that the last question was stricken, and

16

admonished the jury to disregard that question.

On further cross-examination, Mazon acknowledged that Sandra had lied to obtain a restraining order against him as a result of their fight and that he was angry with her, but that he was happy for the restraining order, indicating that he did not want her to try to see him. He then testified further about Sandra's statements to him about the sexual abuse she had experienced. Sandra told him after she was taken from the hospital and put in foster care that she had more to tell him. When asked if she told him that she had been molested by her mother's cousin or her uncle, Mazon replied, "I don't remember if she told me that she was molested by the other person, but she told me that that other person molested her brother."

Subsequently, the defense moved again for a mistrial or, in the alternative, for a curative instruction, on the basis of the prosecutor's purported misconduct during her cross-examination of Mazon. The court denied the motion for a mistrial, and took the issue of a curative instruction under submission, stating that the proposed instructions went "too far," and that the court would "do something," but did not think the situation was "as outrageous" as the defense. Subsequently, the trial court admonished the jury as follows:

"Regarding the exhibits, Mr. Joseph Lopez, a licensed private investigator, testified previously he prepared two reports.... [¶] The court has reviewed the reports and the court is instructing the jury that the reports do not contain any statements that Mr. Lopez told Andrew Mazon any defense theory of the case or that Mr. Lopez had reports from Child Protective Services that Blanca Guardado used things like electrical cords on her children, or that he had reports from Child Protective Services that would reveal any facts about Blanca ... or suggested subjects that Mr. Lopez wanted Andy to confirm."

During her closing argument rebuttal, the prosecutor argued that, looking at the reports and Mazon's testimony, that he must have been given details of the case. The court overruled the defense objection to this statement, ruling that the prosecution was entitled to make the argument. The prosecutor continued, arguing that Mazon's testimony about Blanca's purported abuse was "preposterous" because during the time, late 2003 and 2004, the family was deeply involved with the police, CPS, and counselors, suggesting that Mazon was lying in his testimony, and implying that he was given information from a 1994 CPS record. The trial court overruled another defense objection to this line of argument. The prosecutor referred to Mazon's testimony that the investigator told him about the case and the defense theory that there was a plot orchestrated by a violent mother, at which point the defense again objected. The court sustained this defense objection. The prosecutor continued, arguing that Mazon "told so many lies it was ridiculous." When she stated, "Of course, we assume that he had been provided the facts before he gave his statements he admitted," the defense again objected that this was misconduct, which the court overruled.

Rodriguez, 2010 WL 453543 at *15-16.

### a.    Procedural Default

As to the purported instances of prosecutorial misconduct – in cross and closing –

1   the court of appeal held that the issue was not properly presented to them and, alternatively,

2   that the claims were without merit.

3          As to the contention that the prosecutor engaged in misconduct in cross-examination,

4   the court of appeal said:

5                Defendant appears to argue, albeit in one sentence, that the prosecutor
       committed prejudicial misconduct in his cross-examination by suggesting that
6      the defense had "schooled [Mazon] on the defense theory that the prosecutor
       had asked questions which suggested facts harmful to [defendant] absent a
7      good faith belief on the part of the prosecutor." Although the People do not
       raise the issue, we refer to the basic principle that the appellant bears the
8      burden to properly brief and argue the issues presented. "To demonstrate error,
       appellant must present meaningful legal analysis supported by citations to
9      authority ... that support the claim of error. [Citations.] ... [C]onclusory claims
       of error will fail." (In re S.C. (2006) 138 Cal. App. 4th 396, 408.) "An
10     appellate court is not required to consider alleged errors where the appellant
       merely complains of them without pertinent argument." (Strutt v. Ontario Sav.
11     & Loan Assn. (1972) 28 Cal. App. 3d 866, 873; see also People v. Stanley
       (1995) 10 Cal. 4th 764, 793.) Defendant does not present any authority or legal
12     argument to explain how the prosecutor's cross-examination was prejudicial
       misconduct, despite the trial court's sustaining of the defense objection to one
13     of the questions, its instruction to the jury to ignore that question, and its
       subsequent admonition to the jury that the investigator reports did not contain
14     statements that might have been implied by the prosecutor's questions (which
       admonition defendant does not mention in his opening brief summary of the
15     proceedings below regarding the purported misconduct). Therefore, we
       disregard this argument.
16
    Rodriguez, 2010 WL 453543 at *17.
17
18         As to the contention that there was prosecutorial misconduct in closing, the court of

    appeal said:
19
20     Defendant fails to meet his burden on appeal of establishing that the trial court
       erred in allowing most of the prosecutor's rebuttal argument, or that the
21     prosecutor could not argue that Mazon was lying. Once more, we refer to the
       basic principle that the appellant bears the burden to properly brief and argue
22     the issues presented, and that conclusory claims of error will fail. (In re S.C.,
       supra, 138 Cal. App. 4th at p. 408.) Defendant also does not direct us to the
23     investigator reports themselves, and we have no obligation to comb the record
       for them. (Grant-Burton v. Covenant Care, Inc. (2002) 99 Cal. App. 4th 1361,
24     1379 [an appellate court may disregard any factual contention not supported by
       proper citation to the record].) Therefore, we disregard this argument as well.

25  Id., *17.

26         Respondent contends that this claim was procedurally defaulted. The state bears the

27  burden of proving the adequacy of a state procedural bar. Bennett v. Mueller, 322 F.3d 573,

28  585-86 (9th Cir. 2003). Once the state has adequately pled the existence of an independent

United States District Court
For the Northern District of California

and adequate state procedural ground as an affirmative defense, as here, the burden to place that defense in issue shifts to the petitioner.  See id.; see also Carter v. Giurbino, 385 F.3d 1194, 1198 (9th Cir. 2004) (finding that the state has met its burden where petitioner failed to "argue or come forward with any evidence" that the procedural rule is not firmly established and regularly followed by the California courts). The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule.  Bennett, 322 F.3d at 585-86.  Here, petitioner has chosen not to file a traverse and thus has not countered the respondent's assertion of procedural default.  This claim thus is barred by the default.

### b.   Merits

Alternatively, the court will consider the prosecutorial misconduct claim on the merits.        The appropriate standard of review for claims of prosecutorial misconduct is the narrow one of due process and not the broad exercise of supervisory power.  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Id.; Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

The threshold factor in determining if misconduct amounted to a violation of due process is whether the trial court issued a curative instruction.  When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred.  See Greer v. Miller, 483 U.S. 756, 766 n.8 (1987); Darden, 477 U.S. at 182 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair since curative actions were taken by the trial judge); Tan v. Roberts, 413 F.3d 1101, 1115 (9th Cir. 2005) ("we presume jurors follow the court's instructions absent extraordinary circumstances").  This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the

**United States District Court**
For the Northern District of California

19

1    defendant.  See Greer, 483 U.S. at 766.

2        The court issued a curative instruction here, and petitioner has not shown an

3    overwhelming probability that the jury would be unable to disregard the questioning and the

4    comment in closing to which an objection was sustained.  This claim is without merit.

5        **4.    Apprendi/Blakely/Cunningham Claim**

6        The court imposed the upper term of eight years on counts 9 through 14, which

7    charged rape of Evelyn by means of force or fear.  See Rodriguez, 2010 WL 453543 at *18.

8    Petitioner contends that this violated his rights as announced in Cunningham v. California,

9    549 U.S. 270, 281 (2007), Blakely v. Washington, 542 U.S. 296 (2004), and Apprendi v.

10   New Jersey, 530 U.S. 466 (2000).  This claim was raised on direct review, where the court of

11   appeal held:

12           Any error below was harmless because, as the People point out, the trial
13       court imposed the upper term sentence in part because the victims, including
         Evelyn, were "particularly vulnerable." This is an aggravating factor stated in
14       California Rules of Court, rule 4.421(a)(3). The trial court's vulnerability
         analysis plainly was based at least in part on the fact that defendant attacked
15       Evelyn in their home. The court stated:

16           "This is one of the worst cases of sexual assault that I have seen. As was
         pointed out by the family, the defendant single handedly destroyed a family
17       that had been kind enough to take him into their home. As I listened to the trial,
         I thought how awful it must have been for each of the [victims] to live in that
18       house every day facing the prospect that they would each be sexually assaulted
         by the defendant day after day, week after week, month after month." The
19       court continued, "The defendant raped and assaulted Evelyn continuously and
         turned her childhood into a living nightmare."

20           As our independent research indicates, "courts have recognized the
21       vulnerability of those attacked while in their own home." (People v. Hall
         (1988) 199 Cal. App. 3d 914, 922 [victim attacked in her own home]; People v.
22       Fields (1984) 159 Cal. App. 3d 555, 569-570 [referring to the vulnerability of
         the victim "in that she was attacked in her own home"].)

23           The jury guilty verdict on the charges involving Evelyn make clear that
24       it necessarily found true all of the facts underlying the court's vulnerability
         analysis. Both defendant and Evelyn testified that they lived in the same home.
25       Evelyn further testified that several months after moving in, defendant began
         sexually assaulting her at that home and that, as a result, she was afraid to be
26       home by herself. In order to reach its guilty verdict, the jury necessarily
         determined beyond a reasonable doubt that many of the sexual assaults
27       occurred in the home, as Evelyn and her siblings' testimony indicated. We
         conclude beyond a reasonable doubt that the jury would have found Evelyn
28       "particularly vulnerable" beyond a reasonable doubt. For this reason alone, any
         sentencing error was harmless.

Furthermore, courts have acknowledged that the defendant's relationship to the victim is a circumstance rendering the victim particularly vulnerable. (See People v. Garcia (1983) 147 Cal. App. 3d 1103, 1106-1107 ["[i]t is difficult for us to conceive of a circumstance wherein a child would be more vulnerable to such an offense than when the attack was perpetrated by a person entrusted with the victim's supervision or control"].) As the People point out, the court also imposed the upper term sentence because it found defendant had taken advantage of a position of trust, another aggravating factor. (Cal. Rules of Court, rule 4.421(a)(11).) The court's reliance on this factor could only have referred to defendant's undisputed role as the adult cousin of Evelyn's mother who lived with the family, and the evidence plainly indicated that as a result he had access to, and control over, the children (including when he took them elsewhere, such as to Sequoia Station and his apartment). Defendant's role rendered Evelyn particularly vulnerable, and allowed him to take advantage of a position of trust. We have no doubt the jury would have found that defendant's family role supported the "particularly vulnerable" and "position of trust" factors beyond a reasonable doubt as well.[2]

Rodriguez, 2010 WL 453543 at *19-20 (footnote in original but renumbered)..

A habeas petitioner is not entitled to relief unless the trial error had substantial and injurious effect or influence in determining the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. The court must assess the prejudicial impact of a constitutional error in a state-court criminal trial under the Brecht standard, whether or not the state appellate court recognized the error and reviewed it for harmlessness. Fry v. Pliler, 551 U.S. 112, 121-22 (2007). And as the Supreme Court stated in Fry, it would make "no sense to require formal application of both tests (AEDPA/Chapman and Brecht) when the latter obviously subsumes the former." Fry, 551 U.S. at 120 (emphasis in original).

Whether a trial error had a substantial and injurious effect is not to be analyzed in terms of burdens of proof. O'Neal v. McAninch, 513 U.S. 432, 436-37 (1995); Mancuso v. Olivarez, 292 F.3d 939, 950 n.4 (9th Cir. 2002) (reviewing court must determine independently whether trial error had substantial and injurious effect, without consideration

---

[2] Given our conclusions, we do not address the remainder of the People's harmless error arguments.

of burdens of proof).  Instead, the proper question in assessing harm in a habeas case is, "'Do I, the judge, think that the error substantially influenced the jury's decision?'" O'Neal, 513 U.S. at 436.  If the court is convinced that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.  Id. at 437.  If, on the other hand, the court is not fairly assured that there was no effect on the verdict, it  must reverse. Id.  In the "narrow circumstance" in which the court is in "grave doubt" about whether the error had substantial and injurious effect or influence in determining the jury's verdict, it must assume that the error is not harmless and the petitioner must win.  Id. at 436, 438

Brecht harmless error analysis applies to a Cunningham claim raised in habeas, as here.  See Estrella v. Ollison, 668 F.3d 593, 598-600 (9th Cir. 2011).

As the court of appeal pointed out, it is undisputed that the victim and petitioner lived in the same home, and the jury verdict establishes that Evelyn was abused by petitioner. Given that Evelyn was abused, starting when she was ten years old, in her own home, the court does not have "grave doubt" that if the issue had been presented to a jury, it would have found beyond a reasonable doubt that she was "particularly vulnerable," one of the aggravating factors California sentencing courts may consider in deciding to impose the upper term.  The Cunningham error thus did not have a substantial and injurious effect upon the sentence.  This claim is without merit.

## CONCLUSION

For the reasons set out above, the petition is DENIED.

A certificate of appealability is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED: May 4, 2012

_____
CHARLES R. BREYER
United States District Judge

G:\PRO-SE\CRB\HC.11\Rodriguez, J1.deny-gaw.wpd